282 So.2d 251

**J. D. COLSTON et al. etc.**

v.

**GULF STATES PAPER CORPORATION,**
**a corporation, etc.**

**SC 289.**

Supreme Court of Alabama.

Aug. 30, 1973.

**424**

McQueen, Ray & Allison, Tuscaloosa, for appellees.

Drake, Knowles & Still, University, for appellants.

MERRILL, Justice.

This appeal is from a decree in a declaratory judgment class action in which complainants-appellants were denied the relief sought to have appellee adjudged to be liable for the severance tax levied by Act 169, Acts of Alabama 1945, as amended, and listed in the 1958 Recompilation as Tit. 8, § 231(2) et seq. Further references to the Act will be by the 1958 listings.

Appellants, J. D. Colston and Willie B. Colston, are brothers who are engaged in the business of cutting, hauling and selling pulpwood, generally being known in the trade as pulpwood producers. They operate their own independent business, with their own employees and equipment. Since 1965 they have been selling pulpwood primarily to appellee, Gulf States Paper Corporation, at its Aliceville Chip Mill. Prior to that, they were selling to an independent pulpwood dealer who operated a woodyard at the location now occupied by the Chip Mill. They have cut pulpwood from land owned by appellee and from land owned by others. Appellee exercises no supervision over appellants even when cutting on company land, except to inspect to insure cutting to specifications, and appellee does not supervise the day-to-day operations of appellants.

When a tract of appellee's land is ready for cutting the district superintendent or game management personnel takes a producer to the tract and formulates with him a proposal under which the producer will purchase the standing timber. A pulpwood sale contract is prepared, signed by the producer, and forwarded to the Forestry Division of appellee in Tuscaloosa for final approval. If approved, the contract is executed, under the terms of which standing timber meeting certain specifications is sold to the producer at a stipulated stumpage price.

Under the contract a producer is required to cut to specifications, to account to appellee for the amount of wood cut and to pay the stumpage price accordingly. There are no limitations on the producer's right to sell the pulpwood after it is harvested, except for payment of the stumpage, and there is no requirement that the pulpwood be sold to appellee. Appellants state that they "knew" that they had to sell the pulpwood to appellee, though they were never told they had to, and there is no company policy to that effect. Most of the pulpwood cut from appellee's land is later sold to appellee, though there are instances where wood is sold to others. The timber sales are made to producers who are already delivering to appellee, and the expectation is that they will continue this existing business relationship. This expectation is reinforced in the Aliceville area, where the appellants operate, by the fact that the Aliceville Chip Mill takes tree length logs rather than the normal pulpwood length. Different equipment is required to handle tree length logs, both for the producer and the woodyard, and until comparatively recently no other woodyard in the area was so equipped.

The pulpwood sale contract also contains a provision requiring that the buyer-producer pay the Alabama Forest Products Severance Tax. Appellants state that they were not aware of this provision in the contract though appellee's district superintendent states that he did advise them of it. Since 1965 the tax has been deducted from appellants' payment each week, but they had never protested nor asked about the deduction. Appellants state that they had never read the pulpwood sale contract, and that a copy had never been furnished to them until about one month prior to filing of bill, though they had never requested a copy and there was nothing which would have prevented their reading one.

The arrangement under which producers purchase standing timber from appellee is similar to that under which they purchase standing timber from any other landowner. The stumpage price paid to appellee is competitive, and some other landowners want more for stumpage.

The normal company policy is to issue a purchase order to the producer for a specified quantity of pulpwood at a specified price to be delivered over a three or six-month period. For the area in which the appellants operate this purchase order would be issued by the operations manager at the Demopolis mill. A purchase order is to be executed for each producer, whether he is cutting from company owned or private land, and the terms are identical regardless of where the wood comes from.

The purchase orders do not coincide in time with any pulpwood sale contracts, and are totally independent of any timber sale. The purchase orders specify a delivered price, with no reference to stumpage.

In the case of appellants, only one such purchase order was found in the company records. Normal policy requires a current purchase order on all producers delivering to the mill, and the lack of such purchase orders for the Aliceville Chip Mill is apparently because over supply has not been a problem and the Aliceville personnel did not consider them necessary. Except for a few short periods, normally a week, when the Aliceville woodyard has been overstocked, appellee would purchase any suitable wood delivered.

Each week the producer is paid for the wood delivered, and at the same time is furnished a weekly settlement sheet. This sheet indicates the quantity of wood purchased, the unit price and total price, as well as deductions. Deductions are made for stumpage where appropriate, whether the stumpage is due to appellee or some private landowners. Deductions of stumpage for private landowners are made either at the request of the landowner or the producer, and appellants are content with this procedure since it saves them the trouble of paying the landowner. In addition, deductions are made to repay loans sometimes made by appellee, and on the producer's request to make payments on bank loans and similar independent obligations of the producer. The settlement sheet also discloses the deduction of the appropriate severance tax.

The severance tax is also deducted from a producer's settlement who is cutting pulpwood from land other than that owned by appellee.

Of 250,000 cords of wood that appellee uses per year, about 80,000 cords comes from its own lands.

The trial court, after hearing the testimony, held " * * * that the Alabama Forest Products Severance Tax is not due to be paid by the Respondent, but is, according to law and the terms of the contract of the parties, payable by the Complainants, and a proper and legitimate deduction from sums otherwise due and owing from Respondent to Complainants."

Title 8, § 231(3) levies " * * * a privilege tax on account of the business activities upon every person engaging or continuing to engage in the state in the business of severing timber or any other forest products from the soil, for sale, profit or commercial use whether as owner, lessee, concessionaire or contractor. * * * "

Section 231(2)(f) provides:

" * * * (f) The word 'sever' means to fell, cut or otherwise separate from the soil. Provided, for the purpose of this article, any person who is the owner or lessee of timber, and is also the processor thereof or a manufacturer of products derived therefrom, shall be deemed the person engaged in severing such timber from the soil notwithstanding the fact that the severance is made by an independent contractor or otherwise. * * * "

Appellants contend that under this definition, appellee is both the "owner" and "manufacturer" and it, not appellants, is liable for the tax.

Absent a contract or agreement to the contrary, appellants' contention would be sound. But the agreement, signed by both parties and introduced as complainants' Exhibit 7, provides in paragraph 15 as follows:

"15. The Buyer (appellants) shall report and pay to the State of Alabama the Forest Products Severance Tax for timber cut under this agreement and shall reimburse the Seller (appellee) for any such taxes, which the Seller may be required to pay."

This exhibit and Exhibit 6 were introduced by appellants as representative contracts for the sale of timber and pulpwood

from appellee to appellants and the stumpage rates were: pine pulpwood, $5.00 per unit (5600 lbs.), hardwood pulpwood, $2.00 per unit (6000 lbs.) and sawtimber, $30.00–$40.00 per 1,000 bd. ft.

It was agreed that was the normal and usual method of doing business by other timberland owners.

Appellants introduced Exhibit 5 which was the pulpwood purchase order agreement and which stated the price appellee would pay for the severed timber delivered at its mill. Those prices were: pine, $15.00 (5600 lbs.), soft hardwood, $12.00 (6000 lbs.) and hard hardwood, $11.00 (6000 lbs.).

It is apparent that the contractual arrangement consists of two separate contracts. The first is for the sale of the standing timber, which passes title, fixes a stumpage price per cord and provides that the "Buyer" (appellants) shall be liable for the severance tax on the timber severed.

The second contract governs the price which is paid the "Buyer" for the pulpwood when it is delivered in proper cuts to the mill, regardless of where the wood comes from or what price was paid for stumpage.

Appellants did not and do not contend that they are employees of appellees. They hire and fire their own help, pay them, own their equipment, and testified that they are independent businessmen engaged in a partnership.

■ Under the facts stated and the evidence presented there is no error shown to set aside the finding of the trial court that the appellants, having contracted to pay the severance tax, should pay it.

Appellants contend that the contractual arrangement is a "fiction and a sham." If the arrangement were designed to keep the severance tax from being paid, there might be some merit to the contention. But it is agreed that the severance tax is paid to the State. There is no attempt to avoid payment. The statutory duty is on appellee to collect the tax from whomsoever it may buy pulpwood and timber and pay that tax to the State. There is no dispute that this has been done. We cannot agree that the transactions are a fiction and a sham.

■ Appellants also argue that the contractual arrangement is void and unenforceable as against public policy.

■ The true test to determine whether a contract is unenforceable because of public policy is "whether the public interest is injuriously affected in such substantial manner that private rights and interests should yield to those of the public." Maddox v. Fuller, 233 Ala. 662, 173 So. 12; Lowery v. Zorn, 243 Ala. 285, 9 So.2d 872. Here, the public interest is not affected. The public interest demands that the severance tax be paid. Both appellants and appellee are liable to the State for the tax. They contracted that appellants would pay it and that appellee would collect it and pay it to the State.

Assuming, without conceding, that appellee would be liable for the tax under the statute, parties are still at liberty to contract where no principle of public policy is involved. This court, in Ivey v. Dixon Investment Co., 283 Ala. 590, 219 So.2d 639, stated that "the general rule is that no contract or agreement can modify a law, the exception being where no principle of public policy is violated, parties are at liberty to forego the protection of the law." The exception is applicable here because there is no violation of public policy.

■ Finally, a cogent reason for upholding the decision of the trial court is that a contract which may not be made in compliance with statutory provisions is not void if the statute is merely a revenue measure and is not regulatory and for the protection of the public. The principle is stated in Bowdoin v. Alabama Chemical Co., 201 Ala. 582, 79 So. 4, as follows:

"The rule in this state is that, if a statute was not designed to prohibit the making of contracts without previous compliance with statutory provisions, but

was intended merely to provide revenue, it is not void if no specific prohibition or penalty is provided or imposed. If the conditions of the statute were made for the benefit of the public, and not for the raising of revenue only, an agreement is void that does not comply with the statutory conditions. * * * "

Many cases are cited including Sunflower Lumber Co. v. Turner Supply Co., 158 Ala. 191, 48 So. 510, 132 Am.St.Rep. 20.

The Forest Products Severance Tax Act was a revenue act and made no attempt to regulate the business of cutting or growing timber, nor to specify who might or might not engage in such business, or how it should be conducted, or what kind of contracts they should make. It provided a tax on any severance of trees and provided who should pay the tax, who would collect it and how often the collectors would report.

We find no reason to reverse.

Affirmed.

All the Justices concur.