On August 16, 2001, Derris Lamon Cortner and two others, Shakie Dilworth and Jason Terry, were pulled over and arrested for illegal drugs found in a drink container in the vehicle. Cortner was arrested for the unlawful possession of controlled substances (crack cocaine and marijuana). Law enforcement then searched the purported residence of Cortner, with the permission of George Fletcher, the purported lessee, and confiscated $10,000 in cash. No drugs were recovered from the apartment.
On September 26, 2001, the State filed a civil condemnation action regarding the $10,000, naming Cortner and Fletcher as the defendants. Cortner and Fletcher[1] filed an answer to the complaint; they alleged that the $10,000 had not been raised from or used in conjunction with any illegal drug activities and that, therefore, it was not subject to condemnation proceedings.
On May 30, 2002, Cortner and Fletcher signed a written agreement with the State regarding the $10,000. In the agreement, Fletcher claimed ownership of the $10,000, and agreed that $5,000 was to be disbursed to the Drug Task Force and $5,000 was to be disbursed to the attorney representing Fletcher and Cortner on their behalf.
On March 10, 2003, Cortner was indicted for one count of unlawful possession of a controlled substance (cocaine) and one count of unlawful possession of marijuana for personal use, violations of §§ 13A-12-212(a)(1) and 13A-12-214, Ala. Code 1975. On April 3, 2003, Cortner pleaded not guilty to the two charges.
On June 17, 2003, Cortner filed a motion to dismiss based on speedy trial/lack of prosecution grounds. On June 20, 2003, the trial court conducted a hearing on the motion. The trial court conducted another hearing on July 15, 2003. The trial court denied the motion to dismiss on July 16, 2003.
On July 17, 2003, Cortner filed a "Motion to Enforce Settlement Agreement," claiming that the agreement to give part of the $10,000 to the Drug Task Force was based on the State's promise never to charge Cortner with the possession of any drugs arising from the events of August 16, 2001. On July 18, 2003, after further consideration of the evidence submitted by Cortner and the arguments and testimony during the hearing, the trial court ordered the case against Cortner dismissed. In dismissing the indictment against Cortner, the trial court found that an agreement did exist between Cortner and the State and that the agreement was due to be enforced. The State appeals that dismissal.[2]
The State argues on appeal that the trial court erred by finding that the State agreed to dismiss criminal charges against Cortner as part of an attempt to settle the civil condemnation case. The State also argues that, in the alternative, if there was in fact an agreement to dismiss the charges against Cortner, that agreement was never approved by the trial court. *Page 1266 
Initially, we note that none of the State's arguments regarding approval of the agreement were presented to the trial court during the litigation of this case. The State did not, at any point, object to the enforcement of the agreement on the ground that it had not been approved by the trial court; thus, it follows that the State also received no adverse ruling on its assertion that the agreement was void because it had never been approved. Therefore, without an objection, including a stated ground, and an adverse ruling this argument is not properly before this Court. See Phillips v. State, 527 So.2d 154, 156
(Ala. 1988) ("To be reviewable, error must be preserved by properly invoking adverse rulings by the trial court."); andLove v. State, 677 So.2d 1272, 1275 (Ala.Crim.App. 1996) ("`[S]pecific objections are necessary to preserve error.'Reeves v. State, 456 So.2d 1156, 1160 (Ala.Cr.App. 1984). `An adverse ruling by the trial judge is prerequisite for preserving an alleged error in a criminal trial for appellate review.Harrell v. State, 555 So.2d 257 (Ala.Cr.App.), aff'd,555 So.2d 263 (Ala. 1989).'").
In determining whether the trial court erred in enforcing what it found to be a plea agreement, we take note of the following relevant propositions of law:
 "`As this court, per presiding Judge Bowen, noted in Kresler v. State, 462 So.2d 785, 789 (Ala.Crim.App. 1984):
 "`"The [trial] court is in the best position to ascertain the facts, assess the intent of the parties under the plea agreement and, if it was breached, to exercise its discretion and fashion an appropriate remedy. Quoting, United States v. Swinehart, 614 F.2d 853, 859 (3rd Cir.), cert. denied, 449 U.S. 827, 101 S.Ct. 90, 66 L.Ed.2d 30 (1980)."
 "`Certainly, the trial court, in this case, was in a much better position to ascertain the facts and determine the intent of the parties. We find nothing in the record on appeal which discredits the trial court's decision that no plea bargain agreement existed.'
 "Fuller [v. State, 481 So.2d 1178, 1181
(Ala.Crim.App. 1985)]."
Ex parte Swain, 527 So.2d 1279, 1280 (Ala. 1988).
 "[W]e agree with the proposition that contract law cannot be rigidly applied in deciding whether to enforce a broken plea agreement. `Principles of contract law provide a useful analytical framework, but surely they cannot be blindly incorporated into the criminal law in the area of plea bargaining.' United States v. Ocanas, 628 F.2d [353, 358 (5th Cir. 1980)]. Courts enforcing a plea agreement, where defendant has shown no detrimental reliance, have also recognized the limited application contract law has to this problem. Cooper v. United States, 594 F.2d 12 (4th Cir.197[9]); Kisamore v. State, 286 Md. 654, 409 A.2d 719 (1980). Other compelling principles must be given due consideration.
 "Chief Justice Burger, speaking for the majority in Santobello v. New York, [404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971),] observed the importance of negotiated pleas:
 "`The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called "plea bargaining," is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by *Page 1267 
many times the number of judges and court facilities.
 "`Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pre-trial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned. See Brady v. United States, 397 U.S. 742, 751-752, 90 S.Ct. 1463, 1470-1471, 25 L.Ed.2d 747 (1970).
 "Santobello v. New York, 404 U.S. at 260-1, 92 S.Ct. at 498, 30 L.Ed.2d at 432.
". . . .
 "Negotiated pleas, thus, serve a valuable role in the criminal justice system. If the integrity of that role is to be maintained, certainty must prevail. The state need not enter into a plea agreement. It may choose not to do so, and proceed to trial on any case. The United States Supreme Court states there is no constitutional right to a negotiated plea. Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). However, once the state chooses to make an agreement, it should not be allowed to repudiate that agreement with impunity. State v. Brockman, 277 Md. 687, 357 A.2d 376 (1976) (cited with approval in Kisamore v. State, supra). A contrary result would not encourage a defendant to come to grips with the moral and strategic considerations necessary to accepting a negotiated plea, and pleading guilty, if he knows the very agreement he must consider is subject to unilateral speculation by the state. If we allow the state to dishonor at will the agreements it enters into, the result could only serve to weaken the plea negotiating system. Such a result also is inconsistent with the `honesty and integrity' encouraged by Canon 1, Alabama Code of Professional Responsibility.
". . . .
 ". . . We are unaware of any requirement that the agreement be reduced to writing. Regarding negotiated pleas, two commentators have remarked, `[A] plea bargain is a matter of honor between opposing counsel. It is not reduced to writing.' Bailey and Rothblatt, Handling Misdemeanor Cases, § 39 (1976). The same is true in our jurisdiction. Although a plea agreement may be reduced to writing, the prevalent custom in Alabama is that such agreements are verbal understandings between the attorneys involved. We point out this to dispel any suggestion that a plea agreement is unenforceable merely because it is unwritten."
Ex parte Yarber, 437 So.2d 1330, 1334-36 (Ala. 1983) (emphasis added; footnotes omitted).
The evidence at trial was somewhat disputed. "`We note that the trial judge, as the finder of fact, determined the credibility of the witnesses. The trial court's determination regarding credibility of witnesses is entitled to great weight on appeal.Calhoun v. State, 460 So.2d 268 (Ala.Crim.App.198 [4]).'"Morrison v. State, 601 So.2d 165, 174 (Ala.Crim.App. 1992) (quoting Dixon v. State, 588 So.2d 903, 907 (Ala. 1991)). A trial court's ruling on conflicting evidence will not be disturbed *Page 1268 
unless it is palpably contrary to the weight of the evidence.See, e.g., Russell v. State, 739 So.2d 58 (Ala.Crim.App. 1999).
Trial counsel for Cortner, Tim Case, submitted the following memorandums from his file as evidence of the agreement:
 "I have talked with [the Chief Assistant District Attorney] today regarding this case. He stated to me that both George Fletcher and Der[ris] Cortner claimed to David Scogin[3] the Ten Thousand ($10,000.00) Dollars cash did not belong to either one of them. I have talked with Der[ris] Cortner. I stated to him that that would be a statement admissible in court. I stated to him that we could probably win the case[;] however, that doesn't necessarily mean that he would get the money back. I offered to settle this case with [the Chief Assistant District Attorney] with a dismissal of the criminal case and a return of Eight Thousand ($8,000.00) Dollars. [The Chief Assistant District Attorney] said that he would dismiss the case and pay ($5,000.00) Dollars. I stated to him that we would settle for that amount and that that should be made payable to my Trust Account."
(Memorandum, May 29, 2002, C. 22.)
 "I met with Judge Suttle[4] privately this morning. He asked me to explain to him the facts and circumstances of this case. I explained it to him. He stated to me that he would deny the Motion to Dismiss. He stated to me that we would win the Condemnation Case. I explained to him there is also a Criminal Case pending. I stated to him that we agreed to forfeit Five Thousand ($5,000.00) Dollars and be repaid the other Five Thousand ($5,000.00) Dollars. He stated to me that he would not accept the agreement."
(Memorandum, May 30, 2002, C. 23.)
 "I was called by Judge Suttle on Friday morning. He wanted me to remind him of the Agreement that I had reached with the State of Alabama regarding this Civil Forfeiture Case. I reminded him of the Agreement. He stated to me that he has very serious concerns with the State of Alabama and the way this was handled. I went to his office immediately thereafter and showed him copies of the Memorandums from May 29, 2002, and May 30, 2002. Also, I showed him an Agreement that was reached between [the Chief Assistant District Attorney] and I. He stated to me that he had no problem whatsoever with the way I handled this case. Also, he called me back and stated for me not to talk to David Scogins nor to [the Chief Assistant District Attorney] or I would be in big trouble."
(Memorandum, September 9, 2002, C. 24.)
Additionally, the Chief Assistant District Attorney and Tim Case signed the following document that was to be filed in the condemnation proceedings:
"STIPULATION OF DISMISSAL
 "Comes now the State of Alabama and Defendant and jointly moves the court to dismiss the case, and as grounds therefore states that the parties have reached an agreement.
"Done this 30[th] day of May, 2002." *Page 1269 
(C. 38.) Finally, trial counsel submitted an unsigned copy of the following agreement, that was to have been executed between defense counsel and the Chief Assistant District Attorney, regarding the condemnation proceeding:
"AGREEMENT
 "This case coming on to be heard on the 30th day of May, 2002, and the parties now desiring to settle amicably all questions and issues concerning the division of money and disbursement thereof, therefore, in consideration of the above-styled case being dismissed in the Circuit Court of Lauderdale County, it is agreed by the parties as follows:
"1. That Case No. CV-2001-606 will be dismissed.
 "2. That the Defendant, George Fletcher, by and through this agreement acknowledges, for the sole purposes of this agreement, that said money in the amount of Ten Thousand Dollars ($10,000.00) in lawful currency of the United States of America confiscated by the Lauderdale County Drug Task Force was, in fact, his money.
 "3. That all parties agree said money should be divided and disbursed as follows:
 "a. Five Thousand Dollars ($5,000.00) to the Lauderdale County Drug Task Force.
 "b. Five Thousand Dollars ($5,000.00) to Timothy Case, attorney for Defendant[s] George Fletcher and Derris Cortner."
(C. 39-40.)
Further relevant information presented during the two hearings follows:
 1. Cortner testified that he, himself, had knowledge of the fact that he was forfeiting $5,000.00 in return for the dismissal of the case against him (R. 6).
 2. At the time of the hearings on Cortner's motions, the condemnation proceedings were still pending (R. 26).
 3. Defense counsel had been interviewed by the Alabama Bureau of Investigation (ABI) "on several different occasions about this particular case" (R. 16, 34), and the State, in the form of David Scogin, who was no longer with the prosecutor's office, had been contacted by the ABI (R. 20, 40), and perhaps the Drug Task Force had been contacted by the ABI (R. 36).
 4. When asked about the delay in indicting Cortner from his arrest in August 2001 to the indictment in March 2003, the State responded that, "during that time[,] I think the case was continued at least one time by the agreement of all the parties and there was some attempt to try to work out this case, to settle this case" (R. 17). However, later, the State testified that it had "no knowledge" of such an agreement and did not "believe" it had made such an agreement, knowing "the [c]ourt's position on that" (R. 27, 32). Even later, the prosecutor commented that there "probably" were "negotiations," but that he did "not believe that [the State] made any agreements to dismiss a criminal case based on this civil condemnation" (R. 41).
 5. The "Agreement" and "Stipulation of Dismissal" were produced by the prosecutor's office (R. 30).
The trial court's order, which outlines its findings of fact, reads as follows: *Page 1270 
 "THIS CAUSE came before the Court on the defendant's motion to enforce [a] settlement agreement [between him and the State]. This Court has taken testimony at two motion hearings, heard arguments of counsel, and examined the court files of this defendant,[5] as well as the files of the indicted co-defendant. The facts would appear to be these:
 "On or about August 16, 2001, David Scogin, the Chief Investigator for the Lauderdale County District Attorney's Office and then Director of the Lauderdale County Drug Task Force, was advised by an informant that Derris Cortner was in possession of drugs and had a large sum of cash at his apartment. Mr. Scogin stopped a car occupied by Mr. Cortner and two other individuals. All three were removed from the car and a search resulted in controlled substances being found inside a can in the car. All three occupants were arrested and charged.
 "Agents of the Drug Task Force then searched an apartment. Mr. Cortner denied living there and there is no indication that either of the other two arrestees had any connection with the residence. Mr. Cortner stated that George Fletcher lived in the apartment. Mr. Fletcher was located and he gave permission to search. No drugs were found but over $10,000.00 in cash was seized by the Task Force. It is not clear to this Court why agents would take $10,000.00 that was unassociated with any crime.
 "On September 26, 2001, the State filed a civil action against Mr. Cortner and Mr. Fletcher seeking condemnation of $10,279.00. Both men denied the allegations in the civil suit and on March 27, 2002, requested a trial. By order of Judge Suttle, dated April 1, 2002, the State was required to deposit that money with the Clerk of the Court to be disbursed following a trial on the merits.
"That Order has never been obeyed.
 "On May 29, 2003, Mr. Tim Case, attorney for both Mr. Cortner and Mr. Fletcher, entered into negotiations with [the] Chief Assistant District Attorney for settlement of the civil and criminal cases. Mr. Case stated on the record, as an officer of the court, that the negotiations resulted in a firm offer and acceptance of terms of an agreement.
 "In exchange for $5,000.00 of the seized money, the State agreed to dismiss the criminal charges. The remainder of the money would be delivered to Mr. Case for the defendants. An unsigned agreement reflecting that division of the money has been presented to this Court. The civil condemnation file includes a joint motion of Mr. Case and [the Chief Assistant District Attorney], dated May 30, 2002, requesting a dismissal of the action because `the parties have reached an agreement.'
 "When informed of the agreement, Judge Suttle refused to accept the terms and the civil action remains pending.
 "[The Chief Assistant District Attorney], in his response to defendant's motion to dismiss, states `[t]here are no notes or any evidence in the State's file to indicate that any agreement was firmly reached as to disposition of this case and a settlement agreement in the civil condemnation case.'
 "Despite the lack of notes or evidence in the State's file, this Court finds that *Page 1271 
such an agreement was reached. Although no written agreement was filed, there was an oral agreement between the parties, which is enforceable. `[I]t is incongruous to suggest that the results should vary between oral agreements to dismiss and those in writing, so long as they are both component elements of a settlement by the parties.' Helms v. Metropolitan Toyota, Inc., 547 So.2d 881
(Ala.Civ.App. 1989). `Although a plea agreement may be reduced to writing, the prevalent custom in Alabama is that such agreements are verbal understandings between the attorneys involved. We point out this to dispel any suggestion that a plea agreement is unenforceable merely because it is unwritten.' Ex parte Yarber, 437 So.2d 1330 (Ala. 1983).
 "On March 10, 2003, 19 months after arrest, the State, in breach of its agreement, indicted the defendant for Unlawful Possession of a Controlled Substance and Unlawful Possession of Marijuana in the 2nd degree.
 "Defendants are entitled to specific performance of a negotiated plea. Cooper v. United States, 594 F.2d 12 (4th Cir. 1979).[6] `[O]nce the State chooses to make an agreement, it should not be allowed to repudiate that agreement with impunity. . . . If we allow the State to dishonor at will the agreements it enters into, the result could only serve to weaken the plea negotiating system. Such a result also is inconsistent with the "honesty and integrity" encouraged by Canon 1, Alabama Code of Professional Responsibility.' Yarber, supra.
 "The fact that Judge Suttle has refused to honor the agreement of the parties because it is, at the very least, against public policy should not, in good consci[ence], allow the State to proceed with a prosecution it had previously abandoned in exchange for money. The defendant has always stood ready to abide by his part of the bargain and the State shall likewise be bound.
 "Defendant's motion is GRANTED and the criminal case DISMISSED."
(C. 43-46.) Although the facts were disputed, we cannot say that the trial court's findings of fact were palpably contrary to the weight of the evidence. Nonetheless, as to its conclusions of law, for the reasons below, we cannot agree with the trial court's decision to enforce the agreement and dismiss the indictment.
Because we have no cases on point in our jurisdiction and cannot find a similar situation in any other jurisdiction, we look to general contract law for guidance. We begin with these common propositions of law:
 "We recognize the right of freedom of contract, which is well expressed in 17 Am.Jur.2d Contracts, § 178 (1964):
 "`The courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Since the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is to maintain and enforce contracts rather than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare. Rules which say that a given agreement is void as being against public policy are not to be extended arbitrarily, because "if there is one thing which more than another public policy requires *Page 1272 
it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be enforced by courts of justice."
 "`Many courts have cautioned against recklessness in condemning agreements as being in violation of public policy. Public policy, some courts have said, is a term of vague and uncertain meaning which it is the duty of the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law. Other courts have approved the statement of an English judge that public policy is an unruly horse astride of which one may be carried into unknown paths. Considerations such as these have led to the statement that the power of the courts to declare an agreement void for being in contravention of sound public policy is a very delicate and undefined power and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt. The cautionary remarks may be interpreted to mean that in the determination of whether an agreement is against public policy there must be kept in view the rule that where there is no statutory prohibition, the courts do not readily pronounce an agreement invalid on the ground of policy or convenience, but, on the contrary, are inclined to leave men free to regulate their affairs as they think proper. In other words, the courts will not declare an agreement void on the ground of public policy unless it clearly appears to be in violation of the public policy of the state. A similar caution is one to the effect that before a court refuses to recognize an agreement which is made in good faith and stipulates for nothing that is malum in se or malum prohibitum it should be satisfied that the advantage to accrue to the public from its holding is certain and substantial, not theoretical or problematical. It has also been observed that the power to invalidate agreements on the ground of public policy is so far-reaching and so easily abused that it should be called into action to set aside or annul the solemn engagements of parties dealing on equal terms only in cases where the corrupt or dangerous tendency clearly and unequivocally appears upon the face of the agreement itself or is the necessary inference from the matters which are expressed, and that the only apparent exception to this general rule is to be found in those cases where the agreement, though fair and unobjectionable upon its face, is a part of a corrupt scheme and is made to disguise the real nature of the transaction.
 "`It is no doubt correct to say that while public policy forbids the enforcement of an illegal or immoral agreement, it is equally insistent that those which are lawful and contravene none of its rules shall be enforced and not be held invalid on a bare suspicion of illegality. The fact is that since the courts are reluctant to declare an agreement void as against public policy, they will refuse to do so if by any reasonable construction the agreement can be upheld. Along this line, it is said that the paramount public policy is that freedom to contract is not to be interfered *Page 1273 with lightly, and it is the court's duty to sustain the legality of a contract in whole or in part whenever it can do so.'
"(Emphasis added [in Milton Constr.])"
Milton Constr. Co. v. State Highway Dep't, 568 So.2d 784,788-89 (Ala. 1990).
 "`The true test to determine whether a contract is unenforceable because of public policy is whether the public interest is injuriously affected in such a substantial manner that private rights thereunder should yield to the public interest. Colston v. Gulf States Paper Corporation, 291 Ala. 423, 282 So.2d 251 (1973).'
 "Taylor v. Martin, 466 So.2d 977, 979 (Ala.Civ.App. 1985)."
Beverly v. Chandler, 564 So.2d 922, 924 (Ala. 1990).
We hold this agreement to be in violation of public policy in several ways. First, the State should not be allowed to forbear the prosecution of a suspected criminal in return for a payoff. There is a great public interest in prosecuting drug offenders and ensuring that they receive fair and appropriate sentences for their crimes. See, e.g., United States v. McBride,571 F.Supp. 596, 609 (D.C.Tex. 1983). Second, the State should not be allowed to use its greater bargaining power — in this case, being in the position of being able to grant or deny a man's freedom and being in possession of the confiscated money — for profit. It is improper to threaten a defendant in a civil forfeiture proceeding with criminal prosecution, which, effectively, is what occurred here. Finally, the State should not be allowed to effect a taking of personal property without any apparent basis. Citizens need to be secure in their knowledge that their property shall not be taken without cause and without due process.
Additionally, we note that the agreement in this case was unenforceable by the court handling the criminal portion of these proceedings. In this way, this case is analogous to banishment cases. This Court has held that a plea agreement wherein the defendant agrees to leave the jurisdiction as part of his plea agreement is not a valid or enforceable agreement because the defendant could not consent to a sentence beyond the authority of the trial court. See Brown v. State, 660 So.2d 235
(Ala.Crim.App. 1995). Similarly, Cortner could not agree that, in exchange for disposing of the opportunity to charge him pending criminal charge, he and Fletcher agreed to forfeit the $10,000 because the criminal court in this case could not have ordered the civil court to accept the agreement between the parties, and the civil court was unwilling to do so. Therefore, the agreement was impossible to enforce.
Although we sympathize with the trial court in its frustration with the situation, we cannot uphold its decision to order the specific performance of what is clearly an illegal agreement. This Court cannot condone the actions of the State and defense counsel in this matter, that is, the use of their greater bargaining power to essentially coerce money from a defendant, no matter that the defendant was promised his freedom in return. The condemnation proceedings would have determined whether the State was to possess the $10,000. It appears that, because the State's claim of right was in question, and deeply so, it sought to circumvent any determination by the civil court of the ownership of the funds. In fact, as of the time of these proceedings, the State still had not abided by the civil court's order to pay the monies into the civil court so that the condemnation proceedings could begin. It seems that the State and defense counsel eschewed the more acceptable, and ethical, practice of pursuing the condemnation *Page 1274 
of the funds within the confines of the civil proceedings and pursuing the prosecution, or any potential plea agreement, within the confines of the criminal proceedings. Nonetheless, because the original agreement was illegal as against public policy, it was not within the trial court's authority to order its enforcement.
Therefore, for the reasons stated above, we must reverse the judgment and remand this cause to the trial court for proceedings consistent with this opinion. Our reversal of the trial court's decision granting the motion to dismiss the indictment is not to be understood as precluding any further motions for a speedy trial or motions for dismissal, or any rulings on such motions.
REVERSED AND REMANDED.
McMILLAN, P.J., and COBB and SHAW, JJ., concur. BASCHAB and WISE, JJ., concur in the result.
[1] Cortner and Fletcher were represented by the same counsel, Tim Case.
[2] We note that, because jeopardy had not attached at the time of the dismissal of the indictment, direct appeal, rather than mandamus, is the appropriate remedy. See State v. Maddox,828 So.2d 946 (Ala.Crim.App. 2001).
[3] David Scogin was the Chief Investigator for the Lauderdale County District Attorney's Office at the time Cortner was arrested. At the time of the proceedings made the basis of this appeal, he had left the office and was being investigated by the Alabama Bureau of Investigation. (C. 24; R. 40.)
[4] Judge Ned Suttle was handling the civil condemnation suit.
[5] Cortner waived his attorney-client privilege for the limited purpose of the court's examination of his file.
[6] This case has since been overruled on other grounds. SeeMabry v. Johnson, 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437
(1984). We do not rely on this case in our holding.