Rel: June 18, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

————————————————

### SC-2025-0774

————————————————

## Construction Services, LLC, d/b/a MCA Construction, Inc.

### v.

## RAM-Robertsdale Subdivision Partners, LLC, Retail Specialists, LLC, and Rodney Barstein

### Appeal from Baldwin Circuit Court
### (CV-22-900285)

MENDHEIM, Justice.

Construction Services, LLC, d/b/a MCA Construction, Inc. ("MCA"), appeals from the Baldwin Circuit Court's summary judgment entered against it and in favor of RAM-Robertsdale Subdivision Partners, LLC ("RAM"), Retail Specialists, LLC ("Retail Specialists"), and Rodney Barstein concerning MCA's claims in a dispute involving a residential subdivision construction project. We reverse the judgment and remand the case to the circuit court.

## I. Facts

Construction Services, LLC ("Construction Services"), is a Mississippi Corporation. On July 14, 2020, Construction Services incorporated a new business name, MCA Construction, Inc. On August 18, 2020, Construction Services, through its principal William R. Miller, filled out and submitted to the State Licensing Board for General Contractors ("the Board") an application for a general contractor's license in Alabama. Specifically, Construction Services requested a "Building Construction" license based on reciprocity, i.e., the fact that Construction Services had a "Building Construction" license in Mississippi, and based on the fact that Construction Services previously had been licensed in Alabama from 2008 through 2012. The application indicated that

2

Construction Services also was licensed in Louisiana and Florida, and it had been in business since 2002. The application was received by the Board on August 21, 2020. It is undisputed that Construction Services and MCA are the same entity. On October 1, 2020, the Board approved the application and provided MCA a certificate for a general contractor's license classified for "Building Construction" ("BC"). The license also stated that MCA had an "Unlimited" bid-limit classification based on Construction Services' net worth of $815,284.50 and its working capital of $303,329.50.

RAM is an Alabama limited-liability company, and it is the sole owner of a parcel of real property known as Amberly Subdivision in Baldwin County. Retail Specialists is also an Alabama limited-liability company. MCA alleges that Retail Specialists is the manager and one of the owners of RAM and that Barstein is the executive vice president and chief development officer of retail for RAM.

On February 11, 2021, RAM and MCA executed a contract concerning work MCA would perform on the Amberly Subdivision property. Specifically, MCA was to perform "all work necessary or incidental to complete the Amberly Phase I." That work was described by

3

a "Schedule of Values" attached to the contract. The total cost for the work was $1,076,324.77, and it included clearing the property, building roadways, providing for drainage, and installing water and sewer piping for the property.

Before the contract was executed, Jade Consulting, the engineering firm on the Amberly Subdivision project, submitted a "Land Disturbance Application" on behalf of MCA to the city engineer for the City of Robertsdale.[1] In reviewing the application for the land-disturbance permit, the city engineer questioned whether MCA's BC classification on its general contractor's license was sufficient for the storm-piping and water-and-sewer-infrastructure work that MCA would be performing. The city engineer believed that a "Municipal and Utility" ("MU") classification "may also be needed for the license to perform the work contemplated at the Amberly Subdivision Phase 1."

---

[1]RAM contends that the submissions from MCA about the land-disturbance permit are not properly before the Court because they were filed with MCA's original postjudgment motion. However, RAM never filed a motion to strike those submissions. We note that RAM has not contested the fact that MCA was granted the permit or the authenticity of permit submission.

4

Because of that questioning, on January 27, 2021, Miller both called and emailed Tiffany Loveless, the executive director of the Board, to ask whether the BC classification on MCA's license was sufficient to perform the work. Miller expressed the belief that, because MCA was working on a residential subdivision, the issue may not fall within the Board's purview and that what the Robertsdale authorities deemed appropriate would govern. Miller stated that "[t]he long-term solution is to add the MU category to the existing license, and I already have been approved to sit for the exam," but he felt that, at the moment, MCA could continue with the preliminary work at the site. Loveless responded:

> "[T]he clearing and grubbing work you wish to undertake is less than $50,000 and does not fall within the jurisdiction of this agency. A MU classification or MU subclassification(s) is required to do the infrastructure for a subdivision, so it would be best for you to amend your license as soon as possible."

Miller followed up by inquiring as to whether there would be any sort of problem "if this project were an apartment complex, an office complex, a shopping center, or a condo"? Loveless responded: "If this was an apartment complex development, the sitework for the project would fall under your commercial BC license as the sitework is part of the building process."

5

On February 9, 2021, the city engineer approved the land-disturbance permit with the understanding that MCA would obtain an MU classification for its general contractor's license "prior to installing storm pipe [and] utilities."

Shortly after execution of the contract, MCA began work on the Amberly Subdivision project. On March 30, 2021, Jade Consulting submitted MCA's first payment request for work performed and materials purchased between February 1 and March 29. That work included clearing and grubbing, asphalt paving for roads, and providing numerous supplies in preparation for further work. The total for the first payment request was $177,424.79. RAM paid several of MCA's initial payment requests.

On April 30, 2021, Miller passed the examination for obtaining an MU classification. On May 5, 2021, Miller filed with the Board an application to amend the classification of MCA's license to add an MU classification. On May 12, 2021, the Board approved Miller's "classification amendment request" and provided him a certificate of license showing that MCA now possessed both a BC classification and an MU classification on its existing Alabama general contractor's license.

6

The materials for underground construction started to arrive shortly thereafter. RAM continued to pay MCA for work performed on invoices submitted thereafter.

For reasons that are not entirely clear from the record or the submissions of the parties, the relationship between RAM and MCA broke down, causing MCA to stop working on the Amberly Subdivision project. On February 11, 2022, MCA recorded a statement of lien on the Amberly Subdivision property in the amount of $646,375.63 because, MCA alleged, RAM had failed to pay MCA for goods and services provided for the project.

On March 23, 2022, RAM commenced in the Baldwin Circuit Court an action against MCA, Miller, and Caroline Miller. RAM alleged that MCA had performed "defective work on Phase 1 of the Amberly Subdivision" project and that MCA had failed to "pay subcontractors and suppliers who provided goods and/or services at the Amberly Subdivision." RAM asserted several claims against MCA, including breach of statutory duties, breach of contract, negligence, negligent misrepresentation, and accounting.

On June 22, 2022, MCA filed an answer to RAM's complaint, and it asserted counterclaims against RAM as well as third-party claims against Retail Specialists and Barstein.[2] MCA asserted claims of breach of contract and fraud against RAM. Among other things, MCA alleged that it had not been paid for some of the work included in the contract and that it was forced to perform work outside the contract that did not come with an increase in the contract price. MCA also alleged that some of the delay in the project construction had been due to RAM's ordering MCA to prioritize its work on a different subdivision project in Cullman County for RAM's sister corporation, RAM-Ellsworth Subdivision Partners, LLC. On July 22, 2022, RAM, Retail Specialists, and Barstein filed their answer to MCA's counterclaims and third-party claims.

----

[2]As the Court observed in the previous appeal in this case:

> "MCA styled all of its claims as 'counterclaims' and referred to those parties it brought claims against as 'counterclaim defendants.' The circuit court and the other parties followed this nomenclature, even though Retail Specialists and Barstein were 'not [parties] to the action' before MCA filed its answer and counterclaim. Retail Specialists and Barstein are therefore properly viewed as third-party defendants. See Rule 14, Ala. R. Civ. P."

Construction Servs., LLC v. RAM-Robertsdale Subdivision Partners, LLC, 395 So. 3d 468, 469 n.1 (Ala. 2024).

On September 22, 2022, RAM, Retail Specialists, and Barstein ("the RAM parties") filed a summary-judgment motion concerning MCA's claims against them. In their motion, the RAM parties argued that MCA could not recover on any of its claims because, they asserted, MCA was an "unlicensed" general contractor at the time it executed the contract on February 11, 2021. The RAM parties asserted that, because MCA did not have an MU classification for its general contractor's license at the time the contract was executed, MCA was not properly licensed for the work it was performing. As a result, according to the RAM parties, MCA's contract with RAM was void. Because all of MCA's claims against the RAM parties were predicated on MCA's contract with RAM, the RAM parties contended that they were entitled to a summary judgment as to all of those claims.

On October 10, 2022, MCA filed a response in opposition to the RAM parties' summary-judgment motion. MCA argued that it clearly was not an unlicensed general contractor at the time it executed the contract because it possessed a BC-classification general contractor's license on February 11, 2021. MCA further contended that it had not performed over $50,000 of utilities work on the Amberly Subdivision

project before it obtained the MU classification on its general contractor's license. MCA added that there had been a genuine question as to whether MCA even needed an MU classification to perform all the work for Phase 1 of the Amberly Subdivision project, that MCA had followed the advice of government authorities on the subject, that MCA had kept RAM informed about the issue, and that RAM had continued to pay MCA for the work performed after MCA had obtained the MU classification for its license.

On November 1, 2022, the circuit court entered a summary judgment in favor of RAM with respect to all the claims asserted by MCA against it. On November 10, 2022, the circuit court entered an amended summary judgment in favor of all the RAM parties with respect to the claims MCA had asserted against them.

On November 23, 2022, MCA filed a postjudgment motion to alter, amend, or vacate the circuit court's summary judgment. For the most part, MCA reiterated its previous arguments concerning why it believed the contract between RAM and MCA was not void as a result of MCA's not possessing an MU classification on its general contractor's license at the time the contract was executed. However, MCA also attached new

10

submissions to the motion that included an affidavit from the Robertsdale city engineer and the land-disturbance permit issued by the Robertsdale city engineer.

On January 4, 2023, the RAM parties filed a response in opposition to MCA's postjudgment motion. The RAM parties argued that MCA's additional evidence was not "new evidence" because it could have been presented in its response to the summary-judgment motion. On January 9, 2023, MCA filed a reply to the RAM parties' response in opposition to the postjudgment motion. In its reply, MCA contended that the RAM parties had "comingle[d] the issue of an unlicensed contractor with a license classification question." On January 10, 2023, the circuit court entered an order denying MCA's postjudgment motion.

On February 17, 2023, MCA filed a motion seeking to have the circuit court's summary judgment entered as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P., so that MCA could file an immediate appeal. Following a hearing, on April 25, 2023, the circuit court entered a "Consent Order" in which it granted MCA's motion to certify as a final judgment the summary judgment entered in favor of the RAM parties as to MCA's claims against them. That order noted that the parties had

11

"agreed on the form of this order" and stated that "[t]his matter presents an 'exceptional' matter that warrants entry of a final judgment pursuant to Rule 54(b)." The order further stated that "[t]he summary judgment order is based on this Court's legal determination on licensure, not a factual dispute between the parties that may be discoverable moving forward towards trial." The order further observed:

> "In making the legal determination on [the RAM parties'] motion for summary judgment, the Court relied on [the RAM parties'] argument that a line of Alabama caselaw recogniz[es] that contracts 'entered into by an unlicensed general contractor are null and void because they violated public policy.' White v. Miller, 718 So. 2d 88, 89 (Ala. Civ. App. 1998); see also Hawkins v. League, 398 So. 2d 232, 235 (Ala. 1981). Notwithstanding this precedent, MCA argued that the Alabama Supreme Court recognized an important exception to this rule that would be applicable to MCA's counterclaims in McNairy v. Sugar Creek Resort, Inc., 576 So. 2d 185 (Ala. 1991). In McNairy, the Alabama Supreme Court recognized that an unlicensed general contractor who receives a license after contractual engagement and begins work may recover on the contract if the contract is ratified by the parties after the contractor receives a proper license."

On June 6, 2023, MCA appealed the circuit court's summary judgment. Despite the circuit court's lengthy explanation as to why its judgment was appropriate for certification as a final judgment under Rule 54(b), on January 12, 2024, this Court concluded in an opinion that "the claims pending below and those on appeal have significant 'factual

overlap,'" and that, therefore, "the circuit court's summary judgment was improperly certified as final." Construction Servs., LLC v. RAM-Robertsdale Subdivision Partners, LLC, 395 So. 3d 468, 471 (Ala. 2024) (quoting Clarke-Mobile Cntys. Gas Dist. v. Prior Energy Corp., 834 So. 2d 88, 95 (Ala. 2002)). Consequently, we dismissed the appeal for lack of jurisdiction.

On May 20, 2025, RAM[3] filed a motion to dismiss its claims against MCA and the Millers without prejudice to "resolve all pending claims, produce a final judgment, and allow the Alabama Supreme Court to decide a pivotal question on appeal: Does McNairy v. Sugar Creek Resorts remain good law? That answer will shape this case and a related federal suit, saving time and resources for everyone."[4]

---

[3]No explanation as to why  is provided in the record, but, after we issued our opinion, Retail Specialists and Barstein were no longer listed as parties in this action.

[4]The "related federal suit" to which RAM referred is RAM-Ellsworth Subdivision Partners, LLC v. Construction Services, LLC, No. 5:22-cv-00779-MHH, Mar. 13, 2024 (N.D. Ala. 2024) (not reported in Federal Supplement), that has been adjudicated in the federal District Court for the Northern District of Alabama. We will discuss that case in more detail in Part III of this opinion.

On May 28, 2025, the circuit court entered an order granting RAM's motion to dismiss its claims against MCA and the Millers, without prejudice. That order stated that the dismissal of RAM's claims "eliminates all remaining claims in this case" and "resolves every pending claim" and, thus, that "[n]o issues remain for adjudication." The order added:

"This case questions the ongoing validity of McNairy v. Sugar Creek Resorts, [576 So. 2d 185, 187 (Ala. 1991),] a 35-year-old decision at odds with Cooper v. Johnston, [283 Ala. 565, 219 So. 2d 392 (1969),] which represents the majority rule in unlicensed contractor law. The split affects this case and a related federal action between the parties on a Cullman County project. The Alabama Supreme Court's guidance will resolve this conflict and clarify the law."

On June 27, 2025, MCA filed a second motion to alter, amend, or vacate the judgment. In that motion, MCA argued that RAM should be estopped from contending that MCA's license was insufficient because, MCA asserted, RAM was aware of the classification issue the entire time it dealt with MCA. MCA also repeated its other arguments concerning having a valid general contractor's license.

On August 22, 2025, RAM filed a response in opposition to MCA's second postjudgment motion. RAM contended that MCA's motion should

14

fail because it was improperly successive and because it presented no newly discovered evidence.

On August 25, 2025, the circuit court denied MCA's second postjudgment motion. MCA filed a timely appeal.

## II. Standard of Review

"This Court's review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So. 2d 72, 74 (Ala. 2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So. 2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So. 2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce 'substantial evidence' as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So. 2d 794, 797-98 (Ala. 1989); Ala. Code 1975, § 12-21-12."

Dow v. Alabama Democratic Party, 897 So. 2d 1035, 1038-39 (Ala. 2004).

## III. Analysis

As the rendition of facts indicates, a determination whether the circuit court erred in entering a summary judgment in the RAM parties' favor turns on the answer to a single question: was MCA an unlicensed

15

general contractor when it executed the Amberly Subdivision Phase I construction contract with RAM on February 11, 2021? The parties arrive at different answers to that question because they have different views of what constitutes an "unlicensed" general contractor. Answering the question requires providing legal background of the statutory licensing scheme for general contractors and the regulations that have been promulgated in support of that scheme, as well as some of the cases this Court has decided in this area of the law.

We begin with the law concerning the licensing of general contractors in Alabama, which is provided in the Alabama General Contractor's Practice Act ("the AGCPA"), § 34-8-1 et seq., Ala. Code 1975. At the time MCA and RAM executed the contract at issue, former § 34-8-1(a), Ala. Code 1975, defined the term "general contractor" as:

> "(a) For the purpose of [the AGCPA], a 'general contractor' is defined to be one who, for a fixed price, commission, fee, or wage undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more,[5]

---

[5]Effective October 1, 2024, § 34-8-1(a), Ala. Code 1975, provides that, as a threshold, "the cost of the undertaking is one hundred thousand

[and] shall be deemed and held to have engaged in the business of general contracting in the State of Alabama."

Under the definition of a "general contractor" in former § 34-8-1, MCA clearly was acting as a general contractor in undertaking the work described in the Amberly Subdivision contract because its performance under the contract included site work, grading, paving, and building water sewer structures, and the total cost for the work exceeded $50,000. Neither party disputes that MCA was acting as a "general contractor" according to former § 34-8-1.

Section 34-8-2(a), Ala. Code 1975, provides that becoming "licensed ... as a general contractor in this state" requires "fil[ing] with the board ... a written application on a form as prescribed for examination by the board ...." That section further states:

> "The applicant shall apply for a license covering the type or types of contracts on which he or she wishes to perform, and shall provide proof of liability insurance. The board shall classify contractors according to the type or types of contracts on which they may perform, within maximum bid limits .... An applicant shall not be so classified as to permit him or her to bid on or to perform a type of work not included in his or her request for a license. If the application is satisfactory to the board, then the applicant may be required to take an

_____

dollars ($100,000) or more." Act No. 2024-277, § 1, Ala. Acts 2024. The higher threshold was not the law at the time MCA and RAM executed the contract at issue.

17

examination to determine his or her qualifications. If the result of the examination of the applicant is satisfactory to the board, <u>the board shall then issue to the applicant a certificate to engage in general contracting in the State of Alabama, stipulating in each license issued the type or types of work the contractor is permitted to bid on or to perform under his or her license</u> and also setting out a letter symbol indicating the maximum limits on which he or she is permitted to bid or to perform in a single contract."

(Emphasis added.) Section 34-8-2(a) goes on to describe "classifications" based on bid limits:

"The following letter symbols indicate the maximum amount bid limits allowed a licensee on any one single contract undertaking:

"A--Not to exceed                 $100,000.00

"B--Not to exceed                 [$]250,000.00

"C--Not to exceed                 [$]500,000.00

"D--Not to exceed                 [$]1,000,000.00

"E--Not to exceed                 [$]3,000,000.00

"U--Unlimited"

However, in the regulations it has promulgated, the Board has expounded upon § 34-8-2(a)'s statement that "[t]he board shall classify contractors according to the type or types of contracts on which they may

18

perform" beyond the bid-limit classifications. Specifically, Rule 230-X-1-.27, Ala. Admin. Code, provides, in part:

"(1) All applicants must request classification(s) of their licenses within the following MAJOR CLASSIFICATIONS. (Applicants must provide a minimum of three projects completed for each sub-classification listed in order to qualify for that Major Classification. Applicants not qualifying for a Major Classification should request specific Sub-Classification(s) and/or Specialty Classifications for which their work experience will meet the minimum experience requirement.)"

(Capitalization in original.) Rule 230-X-1-.27 lists six "major classifications" of work for general contractors: Building Construction, Building Construction under Four Stories, Highways and Streets, Municipal and Utility, Heavy and Railroad Construction, and Specialty Construction. Rule 230-X-1-.27 also provides definitions for the major classifications and subclassifications/specialty classifications listed in that regulation. Relevant to this case are the major classifications of Building Construction and Municipal and Utility, as well as some of their subclassifications.

"(2) (BC) **Building Construction**: Shall include the construction of building structures, including modifications thereof or additions thereto, intended for use for shelter, protection, comfort or convenience. Building construction shall include the excavation and foundations for buildings and work incidental thereto.

19

"(a) **(BC-S) Specialty Construction**: Any of the following special skills and/or trades or crafts may be requested in lieu of the major classification of Building Construction.

"1. **SITEWORK**

"Earthwork

"Fencing

"Other

"2. **CONCRETE**

"Foundations

"Structural Concrete Erection

"Reinforcing Steel

"Precast and Prestressed Concrete Installation

"Other

"....

"....

"(5) **(MU) Municipal and Utility**: Shall include clearing, grubbing, grading, paving, curbs, gutters, walks, alleys, driveways, sewer projects, water projects, gas projects, electric projects, telephone projects, and work incidental thereto.

"(a) **MU-(S) Specialty Construction**: Any of the following specialties may be requested in lieu of the major classification of Municipal and Utility:

"1. Sewer Projects

"2. Water Projects

"3. Gas and Oil Projects

"4. Power Projects and Plants

"5. Telecommunication Projects

"6. Clearing and Grubbing

"7. Site Work Grading

"8. Drainage and Culvert

"9. Paving and Asphalt

"10. Concrete

"11. Pipelines

"12. Gunite

"13. Facilities

"14. Other"

Rule 230-X-1-.27 (bold typeface and capitalization in original).

As we explained in the rendition of the facts, MCA applied for a general contractor's license in August 2020, requesting a BC

classification, and on October 1, 2020, the Board granted MCA a BC license with an "Unlimited" bid-limit classification. On May 12, 2021, the Board granted MCA's "classification amendment request" to add an MU classification to its existing general contractor's license. Rule 230-X-1-.34(10), Ala. Admin. Code, describes such a change as a "license amendment." Similarly, Rule 230-X-1-.43, Ala. Admin. Code, which explains "[t]he fees for the administrative services," provides:

> "3. To change and <u>add classifications of type of work to license</u>, the first change will be seventy-five dollars ($75) and each change in classification thereafter will be fifty dollars ($50) per amendment request."

(Emphasis added.) Thus, the regulations are clear that adding classifications does not require the issuance of a new license or the payment of the higher fees associated with new licenses.

Returning to the AGCPA, § 34-8-5, Ala. Code 1975, provides:

> "<u>The issuance of a certificate by the board shall be evidence</u> that the person, firm, or corporation named therein is entitled to all the rights and privileges <u>of a licensed general contractor to perform work of the types and amounts specified in the license issued to him, her, or it</u> while the license remains unrevoked or unexpired."

(Emphasis added.) Such evidence is important because § 34-8-6(a), Ala. Code, 1975, provides a criminal penalty for performing the work of a

22

general contractor without a license and for certain persons or businesses that accept general-contractor work from "anyone not properly licensed."

> "(a) Any person, firm, or corporation not being duly authorized who shall engage in the business of general contracting in this state, except as provided for in [the AGCPA], and any person, firm, or corporation presenting or attempting to file as its own the license certificate of another, or who shall give false or forged evidence of any kind to the board, or to any member thereof, in obtaining a certificate of license, or who falsely shall impersonate another, or who shall use an expired or revoked certificate of license shall be deemed guilty of a Class A misdemeanor and for each offense for which he or she is convicted shall be punished as provided by law. Furthermore, any person including an owner, architect, engineer, construction manager, or private awarding authority who considers a bid from anyone not properly licensed under [the AGCPA] shall be deemed guilty of a Class B misdemeanor and shall for each offense of which he or she is convicted be punished as provided by law.

> "....

> "(d) The submission of the contractor's current license number before considering the bid shall be sufficient evidence to relieve the owner, architect, engineer, construction manager, or awarding authority of any liability under [the AGCPA]."

§ 34-8-6 (emphasis added).

Likewise, § 34-8-9, Ala. Code 1975, provides that "[a]ny person, firm, or corporation, upon making application to the building inspector or such other authority of any incorporated city, town, village, or county

23

in Alabama charged with the duty of issuing building or other permits for" general-contractor work "shall, before he or she shall be entitled to the issuance of permits, furnish satisfactory proof to the inspector or authority that he or she is duly licensed under [the AGCPA]." That section also provides a criminal penalty for any

> "building inspector or other authority to issue or allow the issuance of the building permit unless and until the applicant has furnished evidence that he or she is either exempt from [the AGCPA] or is duly licensed under [the AGCPA] to carry out or superintend the work for which the permit has been applied."

Id.

Section 34-8-9 is undoubtedly why Robertsdale's city engineer questioned whether MCA's BC classification was sufficient for MCA to be authorized to perform utility work on the Amberly Subdivision project. That questioning led to Miller's discussions with the Board's executive director, Loveless, concerning what work MCA could perform with its BC classification. Loveless told Miller that MCA could perform all the "clearing and grubbing work" with its BC license, but that the underground utility work would require Miller "to amend your license" to have an MU classification.

24

The circuit court entered a summary judgment in favor of the RAM parties because MCA's claims against them were based on the Amberly Subdivision contract. The circuit court essentially held that MCA's contract with RAM was "null and void" because the circuit court determined MCA to be "an unlicensed general contractor" at the time it executed the contract.

The power to declare void a contract executed by an unlicensed general contractor is derived from a gloss this Court has placed the criminal penalty imposed by § 34-8-6 for performing the work of a general contractor without a license.

> "Although § 34-8-6 imposes a misdemeanor penalty for engaging in the acts prohibited therein, this Court has gone further, holding express or implied contracts with unlicensed 'general contractors' to be unenforceable as a violation of public policy. Hawkins v. League, 398 So. 2d 232 (Ala. 1981); Cooper v. Johnston, 283 Ala. 565, 219 So. 2d 392 (1969). Such contracts are illegal and unenforceable by the unlicensed 'general contractor.' Twickenham Station, Inc. v. Beddingfield, 404 So. 2d 43 (Ala. 1981); Hawkins v. League, supra; Tucker v. Walker, 293 Ala. 589, 308 So. 2d 245 (1975); see also Herbert v. Birmingham-Jefferson Civic Center Authority, 694 F.2d 240 (11th Cir. 1982). See generally, Annot., Failure of Building or Construction Artisan to Procure Business or Occupational License as Affecting Enforceability of Contract or Right of Recovery for Work Done, 44 A.L.R.4th 271 (1986). In order to ensure that the regulatory objectives of the licensing statute are met, this Court has held unenforceable contracts based on 'creative schemes' designed

to circumvent its requirements. J & M Indus., Inc. v. Huguley Oil Co., 546 So. 2d 367 (Ala. 1989); Cooper v. Johnston, supra."

Med Plus Props. v. Colcock Constr. Grp., Inc., 628 So. 2d 370, 374 (Ala. 1993) (emphasis added). See, e.g., Architectural Graphics & Constr. Servs., Inc. v. Pitman, 417 So. 2d 574, 576 (Ala. 1982) ("[T]his Court has also held that a contract by an unlicensed 'general contractor,' as defined in § 34-8-1, is null and void as a violation of that public policy."); Hawkins v. League, 398 So. 2d 232, 235 (Ala. 1981) ("Although the statutes themselves provide a misdemeanor penalty for noncompliance, this Court has gone further, holding express or implied contracts with nonlicensed 'general contractors' to be null and void as a violation of public policy."); Triple D Trucking, Inc. v. American Petroleum Equip. & Constr., Inc., 865 So. 2d 1234, 1237 (Ala. Civ. App. 2003) ("'It is well settled that "[e]xpress or implied contracts entered into by an unlicensed general contractor are null and void because they violate public policy."'" (quoting White v. Miller, 718 So. 2d 88, 89 (Ala. Civ. App. 1998), quoting in turn Goodwin v. Morris, 428 So. 2d 78, 79 (Ala. Civ. App. 1983)).

The Court previously has described the public policy that it believes to be behind the AGCPA:

26

"We are convinced from a review of the original and amendatory acts that it was the intention of the legislature that said acts be enacted for regulation and protection as distinguished from a law created solely for revenue purposes. The primary purpose was to protect the public against incompetent contractors for certain-type structures, and also to better assure properly constructed structures which were free from defects and dangers to the public."

Cooper v. Johnston, 283 Ala. 565, 567, 219 So. 2d 392, 394 (1969).

The Court has emphasized the importance of that public policy in several rulings that have broadly applied the scope of the power to declare contracts void.

"In affirming the judgment below, we find it appropriate to point out that we also reaffirm this Court's commitment to the purpose and intent of the provisions of [the AGCPA]. The importance of the regulatory nature of the statute, and the protection it affords the citizens of Alabama, [cannot] be avoided by unlicensed contractors who, through creative schemes, seek to circumvent the requirements of [the AGCPA]. See, for example, Cochran v. Ozark Country Club, Inc., 339 So. 2d 1023 (Ala. 1976). Similarly, an unlicensed contractor will not be afforded the privileges that come from the statute because of its association with a licensed contractor (see Cooper v. Johnston, [283 Ala. 565, 219 So. 2d 392 (1969)]); because of its obtaining a license subsequent to the execution of the contract (see Architectural Graphics & Construction v. Pitman, 417 So. 2d 574 (Ala. 1982)); or because of the equally inequitable conduct of the other contracting party (see Cochran v. Ozark Country Club, Inc., supra). While the result in the instant case may seem harsh, '[n]evertheless, the statute that we are dealing with is a penal one, and harsh results sometimes flow from the construction

27

of a penal statute.' <u>Hawkins v. League</u>, 398 So. 2d [232,] 237 [(Ala. 1981)]."

<u>J & M Indus., Inc. v. Huguley Oil Co.</u>, 546 So. 2d 367, 371 (Ala. 1989).

RAM argues that the circuit court's ruling is in line with the foregoing cases because it is undisputed that MCA did not possess an MU classification on its general contractor's license at the time it executed the contract on February 11, 2021; instead, MCA held a BC classification on its license. The fact that the Board subsequently granted MCA's application to amend its license on May 12, 2021, so that the license included an MU classification along with the BC classification is irrelevant, RAM contends, because, in cases such as <u>Architectural Graphics</u>, this Court held that obtaining a general contractor's license after execution of the contract does not cure the defect. RAM further insists that it is irrelevant whether RAM was aware that MCA only held a BC license at the time the parties executed the contract because our courts have held that an <u>in pari delicto</u> argument is not a valid basis for overcoming the estoppel defense of a void contract. See <u>KLW Enters., Inc. v. West Alabama Com. Indus., Inc.</u>, 31 So. 3d 136, 140 (Ala. Civ. App. 2009). But see <u>Architectural Graphics</u>, 417 So. 2d at 576-77 (stating that an unlicensed general contractor's argument that the parties with whom

28

it contracted "should be estopped to raise this defense" that the contract is void because "the parties were in pari delicto" has "some appeal," but concluding that the Court "cannot address [that argument] because the record is devoid of any evidence whatsoever to either support or contradict [the unlicensed contractor's] contention").

MCA argues that the circuit court's decision is erroneous because all the cases that have declared contracts of general contractors void have involved situations in which the general contractor had no general contractor's license of any kind at the time the contracts were executed. MCA contends: "[T]here is no basis in Alabama law to deem the contract of a licensed contractor void due to an alleged missing classification." MCA's brief, p. 19. MCA further argues that, to the extent that its failure to have an MU classification on its license at the time the contract was executed raises an issue, Miller sought to address the issue even before the execution of the contract by contacting the executive director of the Board. MCA states that this demonstrates that MCA was not attempting "through creative schemes[ ] … to circumvent the requirements of [the AGCPA]." J & M Industries, 546 So. 2d at 371. MCA also notes that the Robertsdale city engineer issued a permit that allowed MCA to work on

the Amberly Subdivision project -- pursuant to § 34-8-9 -- before MCA had amended its license to include the MU classification. Finally, MCA asserts that it obtained the amendment to its license that contained the MU classification before MCA performed any utility work on the Amberly Subdivision project. MCA argues that its acquisition of the MU classification means that, at the least, it substantially complied with the AGCPA, which this Court held was sufficient in <u>McNairy v. Sugar Creek Resort, Inc.</u>, 576 So. 2d 185 (Ala. 1991).

Rather than relying on cases, RAM contends that language in the AGCPA and the regulations the Board has promulgated in conjunction with it support RAM's position. For example, RAM highlights sections of the AGCPA that at least imply that work classifications are part of the licensing scheme. Section 34-8-2(a) provides that, when the Board approves an applicant for a license, "the board shall then issue to the applicant a certificate to engage in general contracting in the State of Alabama, <u>stipulating in each license issued the type or types of work the contractor is permitted to bid on or to perform under his or her license</u> ...." (Emphasis added.) Section 34-8-5 states that "[t]he issuance of a certificate by the board shall be evidence" that the recipient of the

certificate possesses "all the rights and privileges of a licensed general contractor to perform <u>the work of the types</u> and amounts specified in the license issued ...." (Emphasis added.)

But the fact that licenses are supposed to designate the types of work that a licensee has applied to perform does not demonstrate that the most severe sanction this Court applies pursuant to the AGCPA must fall on general contractors who have obtained a license and end up performing work not listed in the regulations as part of the license's classification. Indeed, the clear emphasis for classifications in § 34-8-2(a) is on bidding amounts; the classifications for types of work are subsidiary, as those details are listed in the regulations promulgated in support of the AGCPA.

Moreover, examination of the regulations reveals that there are not clean breaks between the different classifications, especially with respect to the BC classification. As MCA puts it: "RAM claims that the various classifications do not overlap, but a review of the sub-specialties shows distinct overlaps." MCA's reply brief, p. 19. Rule 230-X-1-.27(5)(a) states that MU specialties include, among other things, clearing and grubbing, sitework grading, paving and asphalt work, concrete work, and "other"

things. Rule 230-X-1-.27(2)(a) states that BC specialties include, among other things, sitework, concrete work, earthwork, and "other" things. The overlaps between types of work are why MCA is accurate in stating that "MCA's license allowed it to perform most of the Amberly work." MCA's reply brief, p. 19. The only types of work expressly listed in Rule 230-X-1-.27(5)(a) that are not listed in Rule 230-X-1-.27(2)(a), and which MCA eventually performed, are "sewer projects" and "water projects." MCA reluctantly admits that "the underground utilities[ ] ... may require the additional MU classification," but it argues that it "added the MU classification to its existing license prior to installing the underground utilities." MCA's reply brief, p. 19.

But whether MCA needed the MU classification on its license when it had a BC classification is genuinely unclear under the regulations. In fact, Rule 230-X-1-.26, Ala. Admin. Code, provides:

"(1) Any project in the State of Alabama for construction, erection, modification, alteration, or addition of or to any building, highway, sewer, grading or any improvement or structure where the cost of the undertaking is $50,000 or more ($5,000.00 or more in the case of swimming pools) must be constructed by a contractor licensed by the Board. A general contractor may undertake to construct or superintend the construction of any project if 51% or more of the work as measured by the cost (labor, materials, tools, construction equipment cost and installed equipment) falls within the

32

major classification, subclassification or specific subclassification in which the contractor is licensed. On any project where no major classification, subclassification or specific subclassification constitutes 51% or more of the work as measured by the cost (labor, materials, tools, construction equipment cost and installed equipment), the contractor may undertake to construct or superintend the construction of such project if the contractor is licensed in the major classification, subclassification or specific subclassification which constitutes the greatest part of the work on the project as measured by the cost (labor, materials, tools, construction equipment cost and installed equipment).

"(2) Notwithstanding the foregoing subsection, contractors holding licenses with Building Construction (BC) appearing thereon may undertake to construct or superintend the construction of any project even if 51% or more of the work as measured by the cost (labor, materials, tools, construction equipment cost and installed equipment) falls outside the major classification of Building Construction (BC) so long as such work is required to make the building usable for its intended purpose."

(Emphasis added.)

The fact that the BC classification is the most comprehensive classification for a general contractor under the regulations is precisely why Miller tried to get clarification from the Board's executive director about whether MCA needed to add an MU classification to its license, and it is also why the Robertsdale city engineer approved MCA's land-disturbance permit before MCA had obtained an MU classification on its license. Both MCA and the city engineer were seeking to follow the

33

regulations. RAM is insisting that, despite MCA's good faith, MCA's failure to add the MU classification before it entered into the contract voided the entire transaction.

RAM focuses on the statement in § 34-8-6(a) that

"[a]ny person, firm, or corporation <u>not being duly authorized</u> who shall engage in the business of general contracting in this state, except as provided for in [the AGCPA], ... shall be deemed guilty of a Class A misdemeanor and for each offense for which he or she is convicted shall be punished as provided by law."

(Emphasis added.) RAM argues that "duly authorized" means possessing a correctly classified license. RAM posits that if "any license from the Board satisfies the statute, no matter how unrelated to the work at hand," the word "duly" would be "mere surplusage" and "the distinction between BC and MU that the regulation plainly draws" would be meaningless. RAM's brief, p. 26.

But that reading places inordinate emphasis on the word "duly," especially given that the same wording was used in the original act of 1935 that created the Board and the licensing requirement. See Ala. Acts 1935, Act No. 297, § 12 ("Any person, firm or corporation not being duly authorized who shall engage in the business of general contracting in this State, except as provided in this Act, ... shall be deemed guilty of a

34

misdemeanor ...."). At that time, there were no regulations distinguishing major classifications for the types of work performed. Even though general-contractor licensing has become more specialized in the intervening years, the focus of the criminal sanctions specified in § 34-8-6(a), as with its Code predecessors, remains those "who shall engage in the business of general contracting in this state"; it does not mention classifications or the "types of work" at all. That language dovetails with the definition of a "general contractor" provided in § 34-8-1(a) that lists all types of work undertaken by general contractors along with the threshold amount required to qualify as general-contracting work. Section 34-8-1's definition is what this Court previously has discussed in determinations about whether a contract involving general-contracting work was void. See, e.g., MSE Bldg. Co. v. Stewart/Perry Co., 392 So. 3d 478, 484 (Ala. 2023); Hawkins, 398 So. 2d at 235; Architectural Graphics, 417 So. 2d at 576.

Beyond RAM's strained reading of § 34-8-6(a), there is the fact that MCA is correct in its observation that no Alabama case has determined that a wrong or mistaken classification on a general contractor's license renders a contract involving that general contractor void. Indeed, RAM

admits that no Alabama cases expressly support its position: "Research reveals no prior Alabama case where this Court addresses 'mis-licensure' versus non-licensure." RAM's brief, p. 31 n.4. Nonetheless, RAM insists that "mis-licensure" is equivalent to "non-licensure." "Otherwise," it insists, "the [AGCPA] and decades of jurisprudence would be turned on its head. Clearly the construction industry requires even more regulation now to protect against contractors who are not 'duly authorized' to perform work than when the Act was passed in 1935." Id.

Even though there are no Alabama state-court cases addressing this subject, as the circuit court alluded to in its May 28, 2025, order, there is an Alabama federal-district-court case that has done so: RAM-Ellsworth Subdivision Partners, LLC v. Construction Services, LLC, No. 5:22-cv-00779-MHH, Mar. 13, 2024 (N.D. Ala. 2024) (not reported in Federal Supplement). The facts in RAM-Ellsworth are strikingly similar to those in this case.

> "This action concerns a dispute over work defendant Construction Services LLC, d/b/a MCA Construction, Inc. performed in a housing subdivision in Cullman County, Alabama. Plaintiff RAM-Ellsworth Subdivision Partners, LLC, owned and developed the subdivision. Nearly one year into the project, RAM[-Ellsworth] and MCA had a falling out, and MCA filed a lien against the property for $1,771,933.29.

36

RAM[-Ellsworth] then sued MCA, and MCA asserted counterclaims against RAM[-Ellsworth]."

Id. Specifically, "sometime before July 2020, RAM[-Ellsworth] ... contracted with Meredith Environmental, Inc. for infrastructure and sitework for phase 1 of the Ellsworth Subdivision project in Cullman, Alabama." Id. However, after work began, Miller decided to leave Meredith Environmental, but he agreed to keep working on the Ellsworth Subdivision project under his own company name, MCA.[6] "Between July 2020 and August 2020, MCA submitted three invoices for 'Ellsworth Phase 1 Grading and site prep' totaling $288,852. RAM[-Ellsworth] paid the three invoices. ... When MCA submitted these invoices, neither MCA nor Mr. Miller had an active Alabama general contractor's license." Id. As we know from the facts in the present case, "[o]n October 1, 2020, the Licensing Board issued a general contractor's license to MCA under the name 'Construction Services LLC' with a 'building construction'

_____

[6]The federal district court noted that the parties disagreed as to when Meredith Environmental and Miller split up: RAM-Ellsworth contended that the spit occurred on July 16, 2020, but Miller contended that it occurred in January 2021, after MCA had obtained its Alabama general contractor's license. The federal district court did not believe that factual dispute mattered for resolving the issue whether the contract should be declared void under Alabama public policy. See RAM-Ellsworth, at n.3.

certification." Id. MCA continued to work on the Ellsworth Subdivision project, MCA submitted invoices to RAM-Ellsworth for MCA's work, and RAM-Ellsworth paid those invoices. "On May 12, 2021, MCA added a 'municipal and utilities' classification to its contractor's license." Id. RAM-Ellsworth paid invoices from MCA for work performed after that date. RAM-Ellsworth and MCA had a falling out sometime later, and MCA filed a lien in the amount of $1,771,933.29 on the Ellsworth Subdivision property. In March 2022, RAM-Ellsworth commenced an action against MCA and Miller, and MCA counterclaimed, alleging breach of contract and seeking enforcement of its lien. Miller removed the case to the federal District Court for the Northern District of Alabama.

In the federal case, RAM-Ellsworth filed a summary-judgment motion concerning MCA's claims in which RAM-Ellsworth made the exact same arguments RAM presents in this case: "because MCA did not have a valid Alabama general contractor's license when MCA became responsible for work on the Ellsworth subdivision project, as a matter of public policy, MCA cannot recover for the work it performed," and "even after MCA held a valid general contractor's license under Alabama Code § 34-8-1, the license had the incorrect classification; MCA had a 'building

construction' classification on its license, but the work MCA performed required MCA to have a 'municipal and utility' classification." Id.

The federal district court in RAM-Ellsworth rejected those arguments and denied the summary-judgment motion.

> "The cases on which RAM[-Ellsworth] relies for its argument are distinguishable from this case. In each, the contractor did not have a valid license at any point during the execution or performance of the contract at issue. Cooper[ v. Johnston], [283 Ala. 565,] 219 So. 2d [392,] 396 [(1969)]; Cochran v. Ozark Country Club, Inc., 339 So. 2d 1023, 1024 (Ala. 1976); Dabbs v. Four Tees, Inc., 36 So. 3d 542, 555 (Ala. Civ. App. 2008) ('Because Graves was not a licensed contractor at the time that he performed the work for the Dabbses, their oral contract for the construction of the project is unenforceable.'); White v. Miller, 718 So. 2d 88, 89 (Ala. Civ. App. 1998); Hawkins v. League, 398 So. 2d 232, 237 (Ala. 1981); Architectural Graphics[ & Constr. Servs., Inc. v. Pitman], 417 So. 2d [574,] 576 [(Ala. 1982)] (contractor could not recover for work performed without a license where contractor obtained a valid license after construction was complete); J & M Indus.[, Inc. v. Huguley Oil Co.], 546 So. 2d [367,] 370 [(Ala. 1989)]; KLW Enters., Inc. v. W. Ala. Com. Indus., Inc., 31 So. 3d 136, 140 (Ala. Civ. App. 2009). None of the cases RAM[-Ellsworth] directly cites concerns a general contractor's compliance with the licensing statute during the performance of the contract.

> "The Alabama Supreme Court has permitted general contractors to seek recovery for services rendered without strict compliance with the general contractor's licensing statute. See McNairy v. Sugar Creek Resort, Inc., 576 So. 2d 185, 187 (Ala. 1991) (contractor entitled to seek payment for services where contractor substantially complied with licensing requirements and contract was ratified after

39

contractor received his license); <u>Twickenham Station, Inc. v. Beddingfield</u>, 404 So. 2d 43, 46 (Ala. 1981) ('At all times during the contracts there was a valid general contractor's license in the Beddingfield name. Although the Beddingfields' license did not reflect the exact business entity under which they did business until after the contract was completed, we believe there was substantial compliance with the licensing statute.').

"In <u>McNairy</u>, the general contractor, Mr. McNairy, applied for a contractor's license with Alabama's State Licensing Board on July 6, 1987. 576 So. 2d at 185. With his application, Mr. McNairy filed a confidential financial statement and an authorization for his bank to release information to the Board concerning his finances. 576 So. 2d at 185-86. The bank did not provide Mr. McNairy's information to the Licensing Board on time, so Mr. McNairy's license was delayed until June 20, 1988. 576 So. 2d at 186. Before receiving his license, Mr. McNairy entered a contract with Sugar Creek Resort to clear areas for golfing ranges and build a road. 576 So. 2d at 186. After Mr. McNairy began working on the project and submitted bills to Sugar Creek, Mr. McNairy received his general contractor license. 576 So. 2d at 186. Sugar Creek acknowledged the amount due for work performed both before and after Mr. McNairy received his license. 576 So. 2d at 186. When Sugar Creek paid Mr. McNairy only some of the amount due for his services, Mr. McNairy filed a mechanics lien to recover the balance. 576 So. 2d at 186.

"The trial court reasoned that because Mr. McNairy did not have a general contractor's license when he agreed to perform work for Sugar Creek, he could not recover under the agreement. 576 So. 2d at 186. The Alabama Supreme Court reversed. Though Mr. McNairy did not have a valid license when he entered the agreement with Sugar Creek, 'McNairy continued to perform work for Sugar Creek, and its president, Carroll Wright, continued to acknowledge, both before and

40

after the license was issued, that McNairy was entitled to receive payment for this work.' 576 So. 2d at 187. The Alabama Supreme Court relied on its decision in <u>Day v. Ray E. Friedman & Co.</u>, 395 So. 2d 54 (Ala. 1981). In that case, the Alabama Supreme Court held that allowing a plaintiff who substantially complies with a licensing statute to recover under a contract does not defeat the penal purpose of the licensing statute. 576 So. 2d at 187. The Alabama Supreme Court found that 'the purpose of the statute [was] not defeated by allowing McNairy to proceed to trial on his claim for monies due him for work and labor done under his agreement with Sugar Creek.' 576 So. 2d at 187-88.

"RAM[-Ellsworth] argues that <u>McNairy</u> was wrongly decided, has been 'utterly ignored' by Alabama courts in addressing breach of contract claims with unlicensed contractors, and is factually distinguishable and thus not applicable.... The Court is not persuaded, and this Court is not alone.

In <u>RC Underground v. Western Surety Company</u>, Case No. 5:20-cv-01222-LCB (N.D. Ala. July 14, 2021), plaintiff RC Underground contracted with Bear Communications, LLC to perform drilling work on a public-works project. The day after it signed the agreement for the work, RC applied to the Alabama Secretary of State's Office to do business in Alabama as a foreign company. The Secretary of State's Office initially rejected RC's application but later issued the license. Before RC received its license, RC began working on the project and kept Bear apprised of the status of the license applications. Bear made several payments to RC for its work on the project. After Bear stopped making payments, RC sued Western Surety Company to recover on the bond Western provided Bear for the project.

"Western moved to dismiss, arguing that RC's contract with Bear was unenforceable because RC was not a licensed subcontractor. Citing <u>McNairy</u>, RC argued that dismissal was

41

inappropriate because the company had substantially complied with the contractor licensing requirements. Western argued that the facts were unlike <u>McNairy</u> and that <u>McNairy</u> is an outlier. The district court rejected Western's argument, stating:

> "'Despite Western's protestations to the contrary, <u>McNairy</u>'s facts are markedly similar to those before the Court. The record shows that RC appropriately sought a license from the Secretary, that Bear was aware of RC's application and assisted RC with it, that Bear repeatedly ratified and adopted the parties' agreement before and following licensure, and that the amount RC seeks to collect is directly related to work completed following its licensure. ...

> "'While the Court is mindful that <u>McNairy</u> has been sparsely cited in the 30 years since it was issued, this does not detract from its precedential value. Rather, absent a clear indication to the contrary from the Alabama Supreme Court, <u>McNairy</u> controls and the Court is bound to apply it. ... Because the Alabama Supreme Court has found a substantial compliance exception to the state's contractor licensing requirements and RC's actions meet its requirements, the Court finds dismissal inappropriate.'

"<u>RC Underground</u>, Case No. 5:20-cv-01222-LCB (N.D. Ala. July 14, 2021) ....

"As in <u>RC Underground</u>, this Court concludes that <u>McNairy</u> is binding, relevant authority. As a federal court sitting in diversity, this Court must 'apply the law of the state in which the federal court sits' and 'should, whenever possible, "reach the same result as the state court would reach in deciding the identical issue."' <u>Goodwin v. George Fischer</u>

42

Foundry Sys., Inc., 769 F.2d 708, 711 (11th Cir. 1985) (quoting Trimper v. Nationwide Ins. Co., 540 F. Supp. 1188 (D.S.C. 1982)). Thus, this Court must 'function as an Alabama court in deciding the issue presented in this case' -- that is, whether an agreement to provide construction services is void as a matter of public policy when the general contractor has substantially complied with the state's licensing statute during performance of the contract. Goodwin, 769 F.2d at 711.

"In Goodwin, in addressing whether a contract should not be enforced as a matter of public policy, the Eleventh Circuit observed that Alabama courts have stated: 'the true test to determine whether a contract is unenforceable because of public policy is "whether the public interest is injuriously affected in such substantial manner that private rights and interests should yield to those of the public."' 769 F.2d at 713 (quoting Colston v. Gulf States Paper Corp., [291 Ala. 423,] 282 So. 2d 251, 255 (Ala. 1973)). '[T]he principle that contracts contravening public policy are unenforceable should be applied cautiously and only in cases plainly within the reason for it,' Goodwin, 769 F.2d at 713 (citing Lowery v. Zorn, [243 Ala. 285,] 9 So. 2d 872, 874 (Ala. 1942)), and '[i]t is repeated often in the cases that there must be a dominating public interest,' Goodwin, 769 F.2d at 713 (citing Ex parte Rice, [258 Ala. 132,] 61 So. 2d 7 (Ala. 1952)).

"In a case dealing with the enforceability of a contract under a similar licensing statute, the Alabama Court of Civil Appeals explained the power of a court to declare a contract void as a matter of public policy 'should be exercised only in cases free from doubt':

"'The courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Since the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is to maintain and enforce

43

contracts rather than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare. ...

"'Many courts have cautioned against recklessness in condemning agreements as being in violation of public policy. Public policy, some courts have said, is a term of vague and uncertain meaning which it is the duty of the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law. Other courts have approved the statement of an English judge that public policy is an unruly horse astride of which one may be carried into unknown paths. Considerations such as these have led to the statement that the power of the courts to declare an agreement void for being in contravention of sound public policy is a very delicate and undefined power and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.'

"Terrell v. Oak & Alley Homes, LLC, 334 So. 3d 506, 512-13 (Ala. Civ. App. 2021) (citation omitted) (quoting Milton Const. Co. v. State Highway Dep't, 568 So. 2d 784, 788 (Ala. 1990), overruled in part on other grounds by Ex parte Ala. Dep't of Transp., 978 So. 2d 17, 23 (Ala. 2007)).

"Applying these principles, Alabama public policy does not prevent MCA from recovering for the work it performed for RAM[-Ellsworth] on the Ellsworth project. Even if the parties' agreement concerning the project predates MCA's acquisition of an Alabama license with a proper designation

44

for the work performed, the evidence shows that MCA previously had held an Alabama general contractor's license under the name 'Construction Services LLC,' and MCA was licensed in other states and was seeking reciprocity. The Licensing Board issued MCA's general contractor's license fewer than two months after MCA applied for the license. MCA worked on the Ellsworth project and received payment from RAM[-Ellsworth] for approximately one year before the parties' relationship soured. During that year, RAM[-Ellsworth] and MCA expanded the scope of MCA's work on the Ellsworth project to add sewer repairs. RAM[-Ellsworth] has admitted that it paid MCA's pre-licensure invoices. As in McNairy and RC Underground, the amount that MCA seeks to recover relates directly to work MCA performed after it received its license, and by its partial payments to MCA for work performed after MCA received its license, RAM[-Ellsworth] acknowledged that MCA was entitled to receive payment for services rendered. Allowing MCA to recover for work performed for RAM[-Ellsworth] does not defeat the purpose of Alabama's general contractor's licensing statute.

"To the extent RAM[-Ellsworth] argues that MCA did not have the correct license classification for the work performed, RAM[-Ellsworth] has not cited binding or persuasive authority to support the proposition that a contractor with a valid license cannot recover for work performed because the license did not have the correct classification.[5] If MCA had to have a 'municipal and utility' classification on its license for the work it performed, McNairy still applies because MCA substantially complied with the statute.

"_____

"[5]To support its argument that MCA cannot recover because it did not have the correct classification on its license, RAM[-Ellsworth] points to a case in the Circuit Court of Baldwin County, Alabama involving a nearly identical

45

dispute between MCA and RAM-Robertsdale Subdivision Partners, LLC. <u>RAM-Robertsdale Subdivision Partners, LLC v. Constr. Servs., LLC d/b/a MCA Construction, Inc., et al.</u>, 05-CV-2022-900285 (Cir. Ct. Baldwin Cnty. Nov. 10, 2022), <u>appeal dismissed sub nom. Constr. Servs., LLC v. RAM-Robertsdale Subdivisions Partners, LLC</u>, 395 So. 3d 468 ... (Ala. 2024). There, the state trial court granted summary judgment in favor of RAM-Robertsdale on the issue of whether MCA was barred from enforcing its contract because it did not have a 'municipal and utility' classification. The trial court's decision is not binding on this Court, and the trial court offered no explanation or analysis for its ruling. ... Therefore, the Court will not follow the state trial court's decision."

<u>Id.</u>

Although the facts in <u>RAM-Ellsworth</u> are very similar to those in this case, <u>RAM-Ellsworth</u> presented the further complication that MCA did not possess an Alabama general contractor's license of any kind when it assumed the responsibility of working on the Ellsworth Subdivision project. In contrast, in this case, it is undisputed that MCA possessed a general contractor's license with a BC classification before it executed the contract with RAM. Here, RAM essentially argues that the distinction is irrelevant because a "mis-classified" license is the same as possessing no license -- even though none of our cases have so held.

What <u>RAM-Ellsworth</u> -- and the Alabama case the federal district court relies upon, <u>McNairy</u> -- illuminate is that there is a difference

46

between regulatory exactitude and the application of court-imposed public policy. RAM contends, as RAM-Ellsworth did in the federal district court, that <u>McNairy</u> is a "lonely outlier" that "Alabama appellate courts have since ignored," and yet, simultaneously, that it somehow has "created confusion and havoc." RAM's brief, p. 51. RAM asks us to overrule <u>McNairy</u>. However, as the <u>RAM-Ellsworth</u> court noted, <u>McNairy</u> is similar in principle to <u>Twickenham Station, Inc. v. Beddingfield</u>, 404 So. 2d 43 (Ala. 1981). <u>Beddingfield</u> concerned the validity of contracts between a restaurant, Twickenham Station, Inc. ("Twickenham"), and a family's construction company ("the Beddingfields") for the Beddingfields to perform work on Twickenham's establishment. The Beddingfields sometimes labeled their entity a "partnership" and sometimes labeled it a "corporation" -- in part because they did not understand the legal differences between the two types of entities. There was conflicting evidence as to whether the contracts were executed in the name of the partnership or the corporation. Regardless, neither the partnership name nor the corporate name was the exact name on the Beddingfields' general contractor's license. Twickenham contended that, "because a general contractor's license was not issued in the name under which [the

47

Beddingfields] were doing business, there was no compliance with [the AGCPA], and that the contracts were, thus, null and void." Beddingfield, 404 So. 2d at 45. The Court disagreed with Twickenham, contrasting the facts with those in Cooper because Twickenham had contended that Cooper supported its position.

> "We are of the opinion that Cooper[ v. Johnston, 283 Ala. 565, 219 So. 2d 392 (1969),] is controlling, but we interpret it differently from the construction Twickenham places on it. In Cooper, this court denied recovery under a construction contract to Johnston, an unlicensed general contractor who attempted to circumvent the licensing statute. There, Johnston, by written authorization, sought to use the license of Gunn Lumber Company to perform the work of a general contractor. In reviewing the written authorization, this court wrote:
>
>> "'[It was nothing] more than an effort on the part of Gunn Lumber Company, based on a consideration, to permit appellee to use its license in the execution of the contract for the erection of the building. Appellee was not connected with Gunn Lumber Company as an officer, partner or employee. The writing was just an attempt on the part of appellee to escape the provisions of [the AGCPA] and to operate in the field of general contracting contrary to law. Gunn Lumber Company was in no way responsible for the erection of the building, nor was it a party directly or indirectly, to the contract of appellee for such erection. We find no provision in [the AGCPA] permitting one to use the contractor's license of another in the manner here undertaken.'

48

"Cooper, [283 Ala.] at 569, 219 So. 2d 392.

"The facts in Cooper are different from those in this case. Unlike Cooper, there was not an attempt by the Beddingfields to circumvent [the AGCPA]. At all times during the contracts there was a valid general contractor's license in the Beddingfield name. Although the Beddingfields' license did not reflect the exact business entity under which they did business until after the contract was completed, we believe there was substantial compliance with the licensing statute. There is little doubt from the record that the discrepancy between the name in which the Beddingfield license was held and that under which they contracted was due to a lack of business sophistication. Twickenham's contention that a fraud was worked upon it is wholly without merit. Clayton Broch, who negotiated both contracts on behalf of Twickenham, testified, regarding the Montgomery contract, that he did not believe the Beddingfields' corporation to be more reliable than their partnership, and that he had no knowledge as to how they were licensed as general contractors. The record is devoid of a showing of fraud on the Beddingfields' part."

Id. at 46.

Thus, as in McNairy, the Court in Beddingfield concluded that the general contractor had substantially complied with the AGCPA. RAM's only response to Beddingfield is an assertion, without further explanation, that "[a] misnamed contractor classified for the correct type of work does not pose the same public harms as MCA does." RAM's brief, p. 46 n.10. It is unclear to this Court what "public harms" RAM is referring to given that MCA possessed a general contractor's license with

49

a BC classification for the entire duration of its work on the Amberly Subdivision project, and MCA added an MU classification before it began the utility work.[7] Like the general contractors in McNairy and Beddingfield, and unlike the general contractor in Cooper, MCA's actions were not "based on 'creative schemes' designed to circumvent [the AGCPA's] requirements." Med Plus Properties, 628 So. 2d at 374 (quoting J & M Industries, 546 So. 2d at 371)). MCA attempted to comply with the AGCPA and its supporting regulations in every way. In fact, unlike the situations in McNairy and RAM-Ellsworth, MCA did possess a general contractor's license at the time the contract with RAM was executed.

In the situation presented in this case, we see no reason to invoke the public policy of declaring the contract between RAM and MCA void on the ground that MCA lacked an MU classification at the time the contract was executed. The language in the AGCPA does not require the application of our public policy when it will not serve the purpose of "protect[ing] the public against incompetent contractors for certain-type

---

[7]RAM itself apparently foresaw no dangers with MCA's licensing situation because it contracted with MCA when it held a general contractor's license with a BC classification, RAM repeatedly paid MCA invoices when MCA did not have an MU classification, and RAM also paid MCA after it added the MU classification to its license.

structures." <u>Cooper</u>, 283 Ala. at 567, 219 at 394. Here, there is no evidence that MCA had engaged in a scheme to circumvent the licensing requirements of the AGCPA. At the very least, MCA substantially complied with the AGCPA. Therefore, the circuit court's summary judgment was erroneous.

## IV. Conclusion

Based on the foregoing, we reverse the circuit court's summary judgment in favor of the RAM parties, and we remand the case for further proceedings.

REVERSED AND REMANDED.

Stewart, C.J., and Shaw, Bryan, and McCool, JJ., concur.